**EPE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Amalgamated Clothing and Textile Workers Union, AFL–CIO, CLC, Intervenor.**

No. 87–3850.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 3, 1988.

Decided May 5, 1988.

---

James Allan Smith (R. Steve Ensor, Smith, Currie & Hancock, Atlanta, Ga., on brief), for petitioner.

Allen R. Ferguson, Jr., N.L.R.B., Washington, D.C., Joel Ronald Ax, New York City, (Peter Winkler, Supervisory Atty., Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Washington, D.C., on brief) for respondent.

Before WILKINSON, Circuit Judge, HAYNSWORTH, Senior Circuit Judge, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

WILKINSON, Circuit Judge:

EPE, Inc. appeals a decision of the National Labor Relations Board holding that EPE remained obligated to abide by the terms of its collective bargaining agreement with the Amalgamated Clothing and Textile Workers Union, AFL–CIO after 100% of EPE's stock was purchased by Echlin, Inc. The Board held that because EPE remained bound by the agreement, several of EPE's actions, including withdrawal of recognition from the union, refusals to furnish information, unilateral dealings with employees, and the institution of a new attendance policy, constituted violations of section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). The Board also found that EPE committed independent violations of section 8(a)(1) of the Act by forbidding distribution of union literature and announcing that union employees would not be entitled to the same benefits as nonunion employees.

Given the deference to which the Board is entitled, we decline to disturb its finding that EPE was a continuing employer and was required to honor the collective bargaining agreement. Further, the Board's findings that EPE violated the Act following its repudiation of the agreement are supported by substantial evidence, with the exception of the Board's finding with regard to the institution of the new attendance policy. The collective bargaining agreement explicitly gave EPE the right to enforce rules of conduct at the plant, and EPE was within its right to promulgate new attendance rules. As to the independent 8(a)(1) violations, we find that the Board's decision is supported by substantial evidence in the record.

I.

EPE, Inc. is a California corporation engaged in the production of "remanufactured" or used auto parts. EPE's headquarters are in Irvine, California, and it operates plants and storage facilities at various other locations. This dispute concerns EPE's plant in Fredericksburg, Virginia.

Labor relations at the Fredericksburg plant, EPE's only unionized operation, have been troubled since at least 1981, the year of the organizing campaign that led to the certification of the union in 1982. Before EPE's stock was sold to Echlin, four unfair labor practice complaints were filed against EPE, and the administrative law judges in the first three cases found EPE guilty of various violations of sections 8(a)(1), (3), and (5), and section 8(d) of the Act. The ALJ holdings in these cases were affirmed by the NLRB and enforced by this court. The fourth case was pending at the time this proceeding began, and was consolidated with the other complaints before us here.

In the period leading up to the stock sale, relations between EPE and the union continued to be strained. EPE and the union began negotiating over a new collective bargaining agreement in early 1984. In the course of a lengthy exchange of correspondence, the union requested various information from EPE, most of which was never supplied.

After several months of negotiation, EPE and the union concluded an agreement in the spring of 1985, to run from July 1, 1984 to August 1, 1987. Four provisions of the agreement are of special relevance to this case. First, the agreement contained an employee profit-sharing plan. Second, it

included a "wage reopener" provision, which permitted either party to reopen the contract for wage discussions in December of 1985 or 1986. Third, it required EPE to furnish information to the union, including seniority lists, pay rates, and weekly hiring and termination notices. Finally, a "management rights" provision reserved to the company certain non-bargainable prerogatives, including the "right to make and enforce safety and security rules and rules of conduct."

Prior to October 22, 1985, all of the stock of EPE was owned by four shareholders—two individuals and two corporations. The record shows that EPE had been losing money and was heavily in debt. Wells Fargo Bank, from which EPE had obtained financing, was threatening to withdraw its support. Under these circumstances, the EPE shareholders entered negotiations with Echlin, a multinational concern engaged in automotive parts production. The record shows that Echlin wished to structure a purchase of EPE as a stock sale in order to preserve EPE's corporate form and take advantage of EPE's losses for tax purposes.

Echlin and the shareholders concluded an agreement in September 1985 under which Echlin would purchase 100% of EPE's stock. The agreement provided that Echlin would assume all of EPE's debts, and would discharge personal guarantees that the shareholders had executed in order to obtain financing for EPE. At Echlin's insistence, the agreement also provided for termination of EPE's employee profit-sharing plan. EPE officials discussed the termination of the profit-sharing plan with the union, and attempted, without success, to get a letter from the union approving the termination. Prior to the consummation of the sale, the shareholders advised Echlin of EPE's collective bargaining agreement with the Union.

Following the stock sale, EPE maintained its identity as an independent California corporation. Echlin retained Jerry Perry in his position as Fredericksburg plant manager. The personnel and production at the plant remained unaltered during the weeks immediately following the stock sale, and the operation of the plant continued essentially as it had under the prior ownership. The same employees worked for the same supervisors on the same assembly lines producing the same automobile parts. Some months later, the company did install new machinery and made adjustments in its product lines. Nonetheless, the operation at the Fredericksburg plant continued basically unchanged.

Shortly after the stock sale, Echlin management decided to repudiate the collective bargaining agreement, but to continue recognition of the union. A company spokesman informed the union that the profit-sharing plan was being terminated. John F. Austin, Echlin's director of employment and labor relations, set up a meeting with union Regional Director Bruce Dunton in order to negotiate a new contract. Before this meeting occurred, however, Perry produced a petition, allegedly signed by Fredericksburg plant employees, stating that the employees no longer wished to be represented by the union.

At the meeting with union officials, Austin stated that EPE had decided to withdraw recognition from the union. The union filed an unfair labor practice charge, stating that the petition was improperly obtained. This charge was dismissed. On November 8, 1985, EPE filed a representation petition seeking a new election in the bargaining unit. The petition was dismissed because there were unfair labor practice charges outstanding against EPE, but EPE was given leave to reinstate the petition in the event the charges were later dismissed.

The union and EPE corresponded on several matters during November and December, 1985. The union requested information from the company on two occasions, but EPE replied that it would not deal with the union due to doubts about its majority status. The union also attempted to invoke the "wage reopener" provision of the collective bargaining agreement, but EPE refused on the ground that Echlin had never accepted the agreement.

During this time, a number of events occurred at the Fredericksburg plant. Shortly after the stock sale, Eric Myers, the new president of EPE, stated that non-union employees could participate in an Echlin profit-sharing plan, but stated that union members could not participate. Around the same time, Perry told Eugene Roberts, who had served for several years as the union's shop steward, that EPE no longer recognized him as shop steward, stated that employees should now take up any grievances directly with the management, and refused to discuss other workers' grievances with Roberts. Also during this period, an incident occurred in which managers told Roberts that he could not distribute union literature on company property. Finally, in December 1985, EPE management met with the employees individually, and unilaterally changed wages and employee classifications at the plant.

In March 1986, EPE placed a new written attendance policy into effect. Prior to that time the attendance policy at the plant was informal. The new policy provided that attendance would be monitored on a daily basis, and imposed a graduated system of punishment for absence and tardiness, from verbal warnings up to dismissal. EPE did not discuss the new attendance policy with the union prior to implementing it, and refused to discuss the plan with the union or to provide information about it.

The union filed several unfair labor practice charges against EPE for the events described above. The charges were heard in August 1986. In November 1986, the ALJ held, *inter alia,* that the refusal to abide by the collective bargaining agreement, the withdrawal of recognition from the union, and the various unilateral changes in employment conditions at the plant constituted violations of sections 8(a)(1) and 8(a)(5) of the Act. The ALJ also found that interference with employee at-tempts to assist each other with grievances and to distribute literature, and the basing of eligibility for profit-sharing on union membership, constituted violations of section 8(a)(1). The ALJ ordered EPE to cease and desist from committing unfair labor practices, to abide by the collective bargaining agreement, and to post remedial notices. The NLRB affirmed the ALJ's decision, with the exception of removing a "visitorial clause" from the remedial order. In addition, the Board ordered EPE to reinstate with backpay any employees discharged as a result of the new attendance policy, and to remove any references to violations of the policy in employees' files. EPE now appeals.

## II.

On the particular facts presented in this case, we defer to the Board's finding that EPE remained bound by the agreement after the stock sale to Echlin. The basic issue here is whether EPE is a "continuing" employer which remained intact and unaltered during these events, or whether EPE became a different entity after the stock sale and thus a "successor" employer. Obviously, a continuing unchanged employer remains bound by its obligations, including a collective bargaining agreement, just as any corporation remains bound by contracts into which it enters. It is well established, however, that a new and different employer that is considered a successor is not bound by its predecessor's agreement, though a successor does have an obligation to bargain with the union that was the recognized representative of the predecessor's employees. *See Fall River Dyeing & Finishing Corp. v. NLRB,* — U.S. —, 107 S.Ct. 2225, 2234, 96 L.Ed.2d 22 (1987); *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 281–82, 92 S.Ct. 1571, 1579, 32 L.Ed.2d 61 (1972).[1]

---

**1.** A new employer may be bound by its predecessor's agreement in certain factual situations. The employer may be found, for example, to have either explicitly or impliedly assumed the collective bargaining obligations of its predecessor. *See, e.g., Burns,* 406 U.S. at 291, 92 S.Ct. at 1584; *NLRB v. Amateyus, Ltd.,* 817 F.2d 996 (2d Cir.1987); *NLRB v. World Evangelism,* 656 F.2d 1349 (9th Cir.1981). Also, in certain cases where a new employer and its predecessor share common ownership, the new employer may be found to be an "alter ego" of the predecessor. In such cases, the new employer may be bound by the predecessor's agreement. *See,*

Substantial evidence supports the NLRB's decision that, on the facts presented here, there was effectively no change of employers. EPE has remained an independent California corporation, bound by its corporate obligations, throughout this controversy. EPE, Inc. is the named party in this dispute, not Echlin, Inc., whose purchase of EPE's stock is claimed to have terminated EPE's obligations. There was no termination of operations or employees at the Fredericksburg plant. Significantly, no severance pay was distributed to the EPE employees, as would have been required in the event of a termination under the 1985 contract. This provides strong evidence of the continuity of the employment relationship between EPE and its workers. Simply put, the Fredericksburg workers both went to work on the morning of Tuesday, October 22, and returned home later that afternoon as EPE employees. During that same time there occurred not a substitution of one employer for another, but a change in the ownership of a continuing employer.

The structure of the transaction that transferred control of EPE to Echlin was no accident. Echlin retained EPE's independent and continuing corporate form in order to obtain the benefits that accompanied it, namely the EPE losses that could be used to offset Echlin income for tax purposes. As the Sixth Circuit observed in the context of a joint employer inquiry, the employer here would have us hold that it "still exists for tax purposes but does not exist for purposes of the labor agreement." *Miami Foundry Corp. v. NLRB*, 682 F.2d 587, 589 (6th Cir.1982). Such a result would not be consistent with the general rule of corporate law that a corporation's obligations continue in force despite a change in share ownership. The corporation and its shareholders are separate legal entities, and a change in the identity of the shareholders does not abrogate the legal obligations of the corporation. In this case, EPE's other contractual obligations

*e.g., NLRB v. Tricor Products, Inc.,* 636 F.2d 266 (10th Cir.1980). None of these theories of em-

clearly continued in force without regard to the stock sale.

The record also shows that Echlin knew of the existence of the collective bargaining agreement prior to its purchase of EPE. Although it is clear that Echlin did not intend to adopt the agreement in light of the specific requirement in the sale agreement that the profit-sharing plan be terminated, it is significant that Echlin decided to purchase EPE as a corporate entity with full knowledge of the CBA. The attempts to procure a letter from the union approving the termination of the profit-sharing plan appear to indicate that the shareholders and Echlin suspected that it would not be possible unilaterally to terminate the agreement's provisions. Prior NLRB decisions suggest that lack of knowledge on the part of an acquirer might preclude enforcement of an agreement following a stock purchase. *See MPE, Inc.,* 226 NLRB 519, 521 (1976). No such lack of knowledge is present here.

Events at the Fredericksburg plant following the stock sale also support the conclusion that EPE was a continuing employer. Operations at the plant were essentially unaffected by the stock transfer. The Fredericksburg plant continued to produce the same products by the same processes. Perry remained in his position as plant manager and continues to occupy that post. Immediately following the stock sale, EPE continued to employ the same supervisors and the same workers at the plant, with only relatively minor changes thereafter.

EPE contends that the ALJ erred in not considering evidence of changes to EPE operations outside the Fredericksburg plant. The Fredericksburg plant, however, was the only bargaining unit involved in this case. For the purpose of determining EPE's labor obligations, the NLRB did not exceed its authority in holding that the proper focus of the continuity inquiry, just as in a successorship determination, is "not on the continuity of the business structure in general, but rather on the particular

ployer obligation is involved in this case.

operations of the business as they affect members of the bargaining unit." *United Food and Commercial Workers International Union v. NLRB*, 768 F.2d 1463, 1470 (D.C.Cir.1985); *see NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 464 (9th Cir.1985).

EPE urges that the Supreme Court's holdings in the successorship cases require that it be relieved, by virtue of the stock sale, from its obligations under the collective bargaining agreement. We acknowledge that the Supreme Court has not had occasion to address the effect of a stock transfer on the labor obligations of a continuing corporation. On the other hand, we reject EPE's contention that the successorship cases govern here. In each of those cases, the Court assumed as its starting point that a new employer had been substituted for the old. In each of them, an entirely new corporate entity replaced a predecessor as the employer. *See Fall River*, 107 S.Ct. at 2229-30; *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 251, 94 S.Ct. 2236, 2238, 41 L.Ed.2d 46 (1974); *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 171, 94 S.Ct. 414, 418, 38 L.Ed.2d 338 (1973); *Burns*, 406 U.S. at 275, 92 S.Ct. at 1576. Three of the cases further involved express terminations of the employment relationship between the workers and the original employer or a hiatus in the operations of the enterprise. *Fall River*, 107 S.Ct. at 2230; *Howard Johnson*, 417 U.S. at 252, 94 S.Ct. at 2238; *Burns*, 406 U.S. at 275, 92 S.Ct. at 1576. These underlying assumptions, which *preceded* the inquiry into the "substantial continuity" that must be shown for a new employer to be found a successor, are conspicuously absent here. As we have discussed above, EPE remained the employing corporation throughout the events here, and operations continued without interruption or terminations.

Neither do we believe that the NLRB's decision here conflicts with the policies expressed by the Court in its prior cases. *Burns* and its progeny sought to promote the policy of industrial peace underlying the NLRA by forestalling the employee frustration that could result if employees found themselves in substantially the same job, but deprived of the representation of their union. *See, e.g., Fall River*, 107 S.Ct. at 2234. The successorship cases therefore required that a successor recognize the union that represented the workers with the predecessor. Similarly, here, industrial peace may suffer if workers find themselves working at the same job for the same corporation, but suddenly deprived of the benefits of a collective bargaining agreement as the result of a stock transaction that, from the workers' point of view, appears little more than an artifice.

Every change in corporate ownership cannot raise the spectre of disruption in the labor relations of the company being bought or sold. *EPE, Inc.*, 284 NLRB No. 21 (1987). The NLRB has summarized its view of the successorship cases and their relevance to facts such as these in this way:

> The concept of 'successorship' as considered by the United States Supreme Court in [*Burns*] and its progeny, contemplates the substitution of one employer for another, where the predecessor employer either terminates its existence or otherwise ceases to have any relationship to the ongoing operations of the successor employer. Once it has been found that this 'break' between predecessor and successor has occurred, the Board and courts then look to other factors to see how wide or narrow this disjunction is, and thus determine to what extent the obligations of the predecessor devolve upon its successor.... Having examined these factors, the Board then decides whether or not the break between the predecessor and successor entities can be bridged.
>
> The stock transfer differs significantly, in its genesis, from the successorship, for the stock transfer involves no break or hiatus between two legal entities, but is, rather, the continuing existence of a legal entity, albeit under different ownership.

*TKB International Corp.*, 240 NLRB 1082, 1083 n. 4 (1979). We must defer to the NLRB's application of this approach to

the facts now before us so long as it is rational and not inconsistent with the NLRA. *E.g., Fall River,* 107 S.Ct. at 2235; *NLRB v. Financial Institution Employees,* 475 U.S. 192, 202, 106 S.Ct. 1007, 1013, 89 L.Ed.2d 151 (1986). On this basis we uphold the NLRB's determination that EPE remained bound by the collective bargaining agreement.

We emphasize, however, that our holding is a narrow one, and that here as in other contexts the effect of a change in ownership on labor obligations is a matter to be considered on the specific facts of a particular case. *See, e.g., Fall River,* 107 S.Ct. at 2236 (inquiry "primarily factual in nature"); *Howard Johnson,* 417 U.S. at 256, 94 S.Ct. at 2240 (in light of the "difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate").

Although we find the collective bargaining agreement was binding on EPE here, we do not adopt a rule that labor agreements remain in force in every situation where corporate ownership changes through a stock sale. On the contrary, a stock sale could in many cases serve as a vehicle for acquisition of resources that will be used to operate a substantially different enterprise from that conducted by the original owners. This would be the case where a new owner, pursuing the policy endorsed in *Burns,* seeks to breathe new life into a moribund corporation by making substantial changes in its operations. *See* 406 U.S. at 287–88, 92 S.Ct. at 1582. Where the corporate form survives only in name, but an entirely new operation replaces the old, the corporation might not be fairly termed a "continuing" employer in any practical sense. Should substantial changes in an operation indicate that its sale was not a "mere substitution of one owner for another through a stock transfer within the context of an ongoing enterprise," the obligations of the employer may

be governed by successorship principles rather than by continued enforcement of an agreement. *See United Food and Commercial Workers v. NLRB,* 768 F.2d 1463, 1471 (D.C.Cir.1985). Indeed, in some cases changes to a business that is acquired through a stock transfer may be so great that the resulting business is not even a "successor." *See Lauer's Furniture Stores, Inc.,* 246 NLRB 360 (1979).

In this case, however, a single corporate entity employed the same workers during the entire course of events. No break in the employment relationship occurred. Further, no changes in the operation occurred following the stock sale that might lead us to conclude that EPE should be considered a new employer despite the structure of the transaction that altered its ownership. We therefore decline to disturb the NLRB's holding that the obligations of the collective bargaining agreement remained in force.

### III.

■ Given the determination that the collective bargaining agreement continued in force following the stock sale, it follows as a matter of course that several of the NLRB's unfair labor practice findings must be affirmed as supported by substantial evidence. Repudiation of a valid collective bargaining agreement constitutes a refusal to bargain in violation of section 8(a)(5) of the NLRA. *Allied Chemical Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

■ The NLRB found on this basis that EPE violated sections 8(a)(1) and 8(a)(5) by refusing to honor the terms of the agreement. Specifically, EPE terminated the profit-sharing provisions of the agreement, refused to furnish information as required by the agreement, and refused to honor the 1985 wage reopener request.[2] The NLRB's determinations as to each of these actions are supported by substantial evidence in the record. *See Universal Cam-*

---

**2.** We also affirm, as supported by substantial evidence, the NLRB's holding that EPE's failures to provide certain information requested by the union constituted violations of sections 8(a)(1) and 8(a)(5) independent of EPE's obligations under the agreement.

*era Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *NLRB v. Nueva Engineering, Inc.,* 761 F.2d 961, 965 (4th Cir.1985).

 The validity of the collective bargaining agreement also precluded EPE from making a proper challenge to the majority status of the union. A duly recognized union generally enjoys an irrebuttable presumption of majority status during the term of a collective bargaining agreement of up to three years, which acts as a bar to challenges of that status by the employer. *See Burns,* 406 U.S. at 290 n. 12, 92 S.Ct. at 1583 n. 12. We therefore uphold the NLRB's determination that the withdrawal of recognition constituted a violation of sections 8(a)(1) and 8(a)(5).[3] Similarly, we find that substantial evidence supports the NLRB's holding that the refusal to recognize shop steward Roberts, the direct contact with employees and bypassing of the union as exclusive bargaining agent, and the unilateral dealing as to wages constituted violations of sections 8(a)(1) and 8(a)(5).

### IV.

 EPE contends that the NLRB's holding that the imposition of a new attendance policy violated the Act must be reversed. We agree. The management rights provision of the 1985 collective bargaining agreement expressly reserved "the right to make and enforce safety and security rules and rules of conduct." The NLRB argues that because EPE would repudiate the collective bargaining agreement, it cannot also seek the benefits of the terms of the agreement. Yet the Board's apparent position is that EPE should be bound to honor the obligations of the agreement but prevented from seeking protection under its terms. Having found that the agreement remained valid, the

question is whether the management rights clause permitted the imposition of the new policy.

Management is entitled to impose new policies where it has reserved the right to do so in a collective bargaining agreement. *E.g., American Stores Packing Co.,* 277 NLRB 1656, 1658 (1986); *Laredo Packing Co.,* 254 NLRB 1, 8 (1981). Reservation of the right to make and enforce "rules of conduct" includes the right to promulgate attendance policies. *See Continental Telephone Co.,* 274 NLRB 1452, 1453 (1985).[4]

The cases cited by the Board for the proposition that EPE's implementation of the attendance policy was improper do not support the Board's argument. In *Ciba–Geigy Pharmaceuticals Division v. NLRB,* 722 F.2d 1120 (3d Cir.1983), the court rejected an argument that an "extra-contractual residual rights" theory allowed imposition of attendance rules. Here, in contrast, the reservation of rights was an explicit part of the written agreement. In *Murphy Diesel Co. v. NLRB,* 454 F.2d 303 (7th Cir.1971), the court emphasized that the "right to impose work rules and discipline" was not a part of the contract or the negotiations leading to it. Just the opposite is true here.

The NLRB's holding with regard to the attendance policy is clearly contrary to the law and facts in this case. We therefore deny enforcement of that part of the Board's remedial order related to the attendance policy.

### V.

 As a final matter, EPE challenges the NLRB's findings with regard to the several independent 8(a)(1) violations. Specifically, the Board found that EPE unlawfully told employees that they should not assist each other in preparing grievances,

---

**3.** The NLRB also found that the withdrawal of recognition and EPE's subsequent actions violated the Act on the ground that there were unremedied unfair labor practices at EPE. In light of our holding that withdrawal of recognition was barred by the collective bargaining agreement, we need not address this aspect of the case.

**4.** Because EPE retained the right to impose the attendance policy without any obligation to bargain, EPE's refusal to provide information about the policy to the union was not a violation of the Act. *See American Stores Packing Co.,* 277 NLRB at 1658; *Emery Industries,* 268 NLRB 824, 824–25 (1984).

prevented distribution of union literature, and told employees that union members would not be eligible for benefits that were to be available to nonunion workers. The Board's finding that these actions constituted section 8(a)(1) violations is supported by substantial evidence.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART.