993 F.2d 1536
 144 L.R.R.M. (BNA) 2744
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
COLUMBIAN CHEMICALS COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
National Labor Relations Board, Petitioner,
v.
Columbian Chemicals Company, Respondent.
 Nos. 92-2224, 92-2225.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 3, 1993
Decided: May 25, 1993
 
 On Petition for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board. (6-CA-21184)
 Ronald Bruce Johnson, Volk, Frankovitch, Anetakis, Recht, Robertson & Hellerstedt, Wheeling, West Virginia, for Petitioner. Linda Jill Dreeben, Supervisory Attorney, NATIONAL Labor Relations Board, Washington, D.C., for Respondent.
 Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy General Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Magdalena S. Revuelta, National Labor Relations Board, Washington, D .C., for Respondent.
 N.L.R.B.
 ENFORCEMENT GRANTED.
 Before HALL, Circuit Judge, POTTER, United States District Judge for the Western District of North Carolina, sitting by designation, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Columbian Chemicals Corp. ("the Company") appeals an order of the National Labor Relations Board ("the Board") finding that its implementation of its Absence Control Program constituted an unfair labor practice in violation of Sections 8(a)(1) and (5) of the National Labor Relations Act ("the NLRA"), 29 U.S.C.s 158(a)(1) and (5). The Board cross-petitions for enforcement of its order. We find no error in the Board's order and grant its petition for enforcement.
 
 
 2
 * Prior to 1988, the Company, which manufactures and sells chemical products, followed an ad hoc policy in disciplining its employees for absenteeism and tardiness under which any action taken by supervisors was discretionary. In April, 1988, representatives of the Company and the union that represents some of the Company's employees ("the Union") met to negotiate a new collective bargaining agreement.
 
 
 3
 During the negotiations, a Company representative mentioned to a Union representative that the Company was preparing a new absentee policy. The Union representative responded that the Company would have to bargain with the Union over the policy. There was no further discussion of the absentee policy during the negotiations.
 
 
 4
 The Company and the Union entered into a collective bargaining agreement ("the Agreement") at the conclusion of the negotiations. The agreement containing a management rights clause which stated:
 
 
 5
 Except to the extent expressly abridged by a specific provision of this Agreement, the Company reserves and retains, solely and exclusively, all of its inherent rights to manage the business in accordance with its best interests as such rights existed prior to the execution of this Agreement with the Union. These rights include but are not limited to ... the right to hire, promote, demote, suspend or discharge for just cause....
 
 
 6
 In June, 1988, the Company announced its intention to implement its new Absence Control Program, and informed the Union that it would not bargain over the program. Under the program, each absence or tardy arrival constitutes an "occurrence." When an employee has had four or more occurrences in a twelve-month period, the supervisor will review the employee's record with him/her and point out that there is a potential attendance problem. When an employee has had six or more occurrences, the supervisor will give the employee a counseling letter and tell him/her that failure to improve will result in disciplinary action. When an employee has had eight or more occurrences, the supervisor will give him/her a letter of reprimand. When an employee has had ten or more occurrences, the supervisor may issue another letter of reprimand or suspend him/her. Finally, when an employee has had twelve or more occurrences in a twelve-month period, if the supervisor "feel[s] that further attempts to rehabilitate the employee will be futile," the employee will be terminated.
 
 
 7
 The Union filed a grievance on July 26, 1988, to block implementation of the Absence Control Program on the ground that the Company was required by the NLRA to bargain about it. The Company implemented the program despite the Union's objection on August 1, 1988, and proceeded to discipline several employees under it. On August 15, 1988, the Union filed an unfair labor practice charge with the Board's regional director alleging that the Company's implementation of the program without bargaining violated the NLRA.
 
 
 8
 In November, 1988, representatives of the Company and the Union met about the grievance. The Union representatives indicated that the grievance could be resolved if the Company made several changes in the Absence Control Program and the Company representatives agreed to make the requested changes. The Union membership, however, voted on the proposal to accept the changes and drop the grievance, and rejected it.
 
 
 9
 The grievance claim went to arbitration and the arbitrator denied it. He reasoned that because the Company has the right to establish reasonable plant rules without bargaining and had not waived this right, it was not required by the NLRA to bargain with the Union about its Absence Control Program.
 
 
 10
 An ALJ then heard the unfair labor practice claim and held that implementing the Absence Control Plan without bargaining was an unfair labor practice in violation of the NLRA. The ALJ recognized the presumption in favor of deferring to an arbitrator's decision where, as here, an arbitrator considered the unfair labor practice at issue, but he concluded that deference was not proper as the arbitrator's decision was based on a misinterpretation of the NLRA. The ALJ concluded that implementing the Absence Control Program without bargaining with the Union was an unfair labor practice under the NLRA because the program was a material change in a term or condition of employment and the Union had not waived its right to bargain with the Company about such a change. Further, he found that any post-hoc discussions in November, 1988, about the program between the Company and the Union did not cure the company's failure to bargain before adopting it.
 
 
 11
 The Board affirmed the ALJ's rulings and adopted its order. With regard to the ALJ's finding that the discussions in November, 1988, had not cured the Company's failure to bargain, the Board stated that after an employer had applied "a unilaterally-implemented policy to employees," as the Company had done in August, 1988, no further discussions by the employer over the policy could cure its failure to bargain.
 
 
 12
 The Company appeals the Board's decision; the Board petitions for enforcement of its order.
 
 II
 
 13
 The Company contends that even if the NLRA required it to bargain with the Union over the Absence Control Program, the Board erred in finding an unfair labor practice because the Union waived its right to bargain about the program in the management rights clause of the collective bargaining agreement. We reject this contention.
 
 
 14
 "[A] union can waive its right to bargain over a ... subject, but such waiver must be clear and unmistakable." Universal Secur. Instruments, Inc. v. N.L.R.B., 649 F.2d 247, 256 (4th Cir.) (quotation omitted), cert. denied, 454 U.S. 965 (1981). In determining whether the union has made such a waiver, the Board may look to the collective bargaining agreement itself as well as to any relevant evidence from negotiations preceding the agreement. American Distributing Co. v. NLRB, 715 F.2d 446, 450 (9th Cir. 1983), cert. denied, 466 U.S. 958 (1984). We will only disturb the Board's finding that the Union here did not waive its right to bargain about absenteeism in the management rights clause if that finding is "not supported by substantial evidence on the record considered as a whole." La Porte Transit Co. v. NLRB, 888 F.2d 1182, 1186 (7th Cir. 1989) (quotation omitted).
 
 
 15
 The Board's finding that the Union did not clearly and unmistakably waive its right to bargain about the Absence Control Program in the management rights clause is supported by substantial evidence on the record. We do not construe the language of the clause to constitute clear and unmistakable waiver by the Union of its right to bargain about the program. The first sentence of the clause, giving the Company the right "to manage the business" without bargaining, does not constitute such a waiver because it is too general. See Murphy Diesel Co. v. NLRB, 454 F.2d 303, 307 (7th Cir. 1971) (management rights clause stating that "all management functions are reserved to the Company" did not constitute waiver by the Union of its right to bargain over an absentee policy.) Nor does the second sentence, which gives the Company the right to "suspend or discharge for just cause" without bargaining. The absence program involved much more than suspension or discharge; it provided for counseling letters, reprimand letters, and meetings with supervisors when an employee's attendance problem was not serious enough to merit suspension or discharge. The contractual right of the Company to suspend and discharge for proper cause without bargaining does not encompass the right to implement unilaterally a program to address these less serious attendance problems, which involve many more employees in many more instances.
 
 
 16
 Our conclusion that the Union did not waive its right to bargain about the absence program in the management rights clause is buttressed by evidence of the conversation about the program between representatives of the Company and the Union at the contract negotiations. A management representative indicated to a Union representative that the Company wanted to implement a new absence program. The Union representative replied that the Company would have to bargain with the Union over the policy. The absentee issue was not broached again during the negotiations. It is difficult to believe, in light of the fact that the new absentee policy was discussed only once at the negotiations and the Union indicated that it was a bargainable issue, that the Union intended the management rights clause to waive its right to bargain over the policy.
 
 
 17
 EPE, Inc. v. NLRB, 845 F.2d 483 (4th Cir. 1988), and NLRB v. United Technologies Corp., 884 F.2d 1569 (2d Cir. 1989), which both found waiver by a union in its collective bargaining agreement of its right to bargain over a new absentee program, are distinguishable. In EPE, the agreement gave the Company the right to make and enforce "rules of conduct" for its employees without bargaining. EPE, 845 F.2d at 491. In United Technologies, the agreement gave the Company the right without bargaining to "make and apply rules ... for production, discipline, efficiency, and safety." United Technologies, 884 F.2d at 1575. In both cases, the language in the agreement was sufficiently specific with regard to making rules such as absentee rules that the agreement could be construed as a"clear and unmistakable" waiver of the union's right to bargain about absentee rules. The case at bar is different because the language of the agreement is much less specific about allowing the Company to adopt rules such as absentee rules and because the negotiations prior to the agreement indicate that the Union did not understand the agreement to waive its right to bargain over the absentee policy.
 
 III
 
 18
 The Company makes several other assignments of error to the Board's decision that its implementation of the Absence Control Program without bargaining constituted an unfair labor practice. We find all of them to be without merit.
 
 
 19
 First, the Company argues that the Board erred in not deferring to the arbitrator's decision that it had not violated the NLRA in implementing the program without bargaining. The arbitrator's opinion, however, manifested a badly mistaken interpretation of the NLRA. Section 8(a)(1) and (5) of the NLRA require that the employer bargain to impasse with the Union on any material change to a term or condition of employment unless the union waives this right to bargain in the collective bargaining agreement. 29 U.S.C.s 158(a)(1), (a)(5). The arbitrator's opinion took exactly the opposite approach, reasoning that the Company has the "basic, deep-seated right to establish unilaterally any reasonable plant rules," including an absentee policy, unless the Company specifically waived this right in the collective bargaining agreement. Because the arbitrator's conclusion that the Company had not violated the NLRA was based on this mistaken interpretation of the NLRA, the Board acted properly in not deferring to the arbitrator's decision.
 
 
 20
 Second, the Company asserts that the Board erred in finding that the Absence Control Program constituted a "material change" from the Company's prior absentee policy over which it was required to bargain. The Company's absentee policy prior to the Absence Control Program, however, was entirely ad hoc and any disciplinary actions taken by supervisors under it were discretionary. The Absence Control Program, by contrast, required supervisors to take certain actions, such as issuing letters of reprimand and "counseling letters" to employees who had certain numbers of absences or tardy arrivals.
 
 
 21
 There was, therefore, no error in the Board's conclusion that the Absence Control Program constituted a material change from the Company's prior absentee policy. See Murphy Diesel Co., 454 F.2d at 307 (enforcing Board order that found a similar absentee program to constitute a material change from the prior ad hoc policy).
 
 
 22
 Finally, the Company contends that even if it violated Section 8(a)(1) and (5) by not bargaining about the Absence Control Program before it adopted it, the Board erred in not finding that it cured this violation because, in its November, 1988, discussions with the Union, it bargained to impasse over the program. When the November, 1988, discussions occurred, however, the Company had already disciplined several employees under the Absence Control Program. The Board determined that, under such circumstances, the November discussions could not constitute the good-faith bargaining to impasse about the program necessary to cure the Company's violations of the NLRA. Because the Company's continuing enforcement of the program may have undermined the Union's ability to assert its position in the belated bargaining, the Board's decision was not erroneous. See La Porte Transit Co., 888 F.2d at 1186.
 
 IV
 
 23
 For the reasons set forth, we find no error in the Board's opinion and enforce its order.
 
 ENFORCEMENT GRANTED