17 F.3d 1434
 145 L.R.R.M. (BNA) 2896, 127 Lab.Cas. P 11,021
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
DOUBLE A COAL COMPANY, INCORPORATED; Double A Coal Company,
Partnership; Zapp Mining, Incorporated, Respondents.
 No. 92-2356.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 25, 1993.
Decided Feb. 16, 1994.
 
 On Application for Enforcement of an Order of the National Labor Relations Board.
 Nancy Janet Gottfried, National Labor Relations Board, Washington, DC, for petitioner.
 Steven Ray Minor, White, Elliott & Bundy, Bristol, VA, for respondent.
 On brief: Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy General Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Paul J. Spielberg, Supervisory Attorney, National Labor Relations Board, Washington, DC, for petitioner.
 Mark M. Lawson, White, Elliott & Bundy, Bristol, Virginia, for respondent.
 
 
 1
 N.L.R.B.
 
 
 2
 ENFORCEMENT GRANTED.
 
 
 3
 Before MURNAGHAN and HAMILTON, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 
 OPINION
 PER CURIAM:
 
 4
 The National Labor Relations Board (NLRB) petitions for enforcement of its order dated May 22, 1992 finding that respondent Double A Coal Company, Inc. (the Company) violated Secs. 8(a)(5) and (1) and Secs. 8(a)(3) and (1) of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 151 et seq. We grant enforcement.
 
 
 5
 James Ashby, president and sole stockholder of Double A Coal Co., Inc. entered a lease agreement with Jewell Ridge Mining Corporation (JRMC) in April of 1988. Under the terms of the agreement, the Company acquired the right to mine coal at JRMC's No. 12-A Mine. One of the provisions in the lease agreement required Ashby to hire employees for the 12-A mine from JRMC's panel of workers who had been employed at the mine previously and who had been laid off of work.[1] Ashby was aware of his contractual obligation to JRMC.
 
 
 6
 On May 31, 1988, JRMC wrote a letter notifying the United Mine Workers of America (the Union) of the lease agreement with the Company and the successorship provision. In August of 1988, Ashby contacted the Union to inform it that he was leasing the old 12-A Mine and that he wished to meet with representatives of the Union before starting production. At the meeting, Ashby stated that he would be recalling employees from the 12-A Mine's laid-off panel.[2] The evidence adduced before the Administrative Law Judge (ALJ) indicated that Ashby did not comply with the pledge he made to the union. The employees were not called from the panel according to accepted procedure, and the panel members who were hired were treated disparately with regard to wages and hours. At the initial meeting with the Union, Ashby offered recalled panel members wages of $55, $60, or $65 per eight-hour shift, depending upon the job classification. Those wages were well below the then-current contractual rates.
 
 
 7
 Later that month, the Company began hiring employees to operate the first of the two portals of the 12-A Mine, designated "Double A Mine # 1." The BCOA agreement required that panel members, selected from the panel by seniority and job qualifications, be offered specific jobs and allowed at least four calendar days to reply. The normal procedure for a lessee was to get in touch with the local union's recording secretary to obtain an up-to-date panel, including the panel members' most recent addresses.
 
 
 8
 Ashby did not go through the union to contact the panel members. He bypassed the local Union, and, on August 18, Ashby sent out purported "recall" letters to 18 panel members. The letter stated that "some" of the 12-A Mine employees were being recalled and announced a meeting on August 20, two days later, for those "accepting this RECALL." There were no offers of specific jobs.[3] On August 27, W.P. Corbett, Mine # 1's first superintendent, sent out a similar letter, announcing a meeting at 9:30 a.m. on August 31, to 3 of the panel members solicited on August 18 and to 12 new panel members.[4] On September 15, Ashby sent out a final group of similar letters to six panel members. The letters announced a meeting on September 23 which gave the men four days to reply, but the letters did not offer specific jobs. Of 81 panel members listed on the Company's and the Union's combined panels, recall letters were sent to 36.[5] An unknown number of nonpanel employees were also hired.
 
 
 9
 The Company commenced operations in August of 1988. Although the 12-A Mine has two portals, the Company began operating only 12-A No. 1. The administrative law judge (ALJ) found that the Company hired five Union members from the 12-A Mine panel to work on the first shift, but that the other first and second shift workers initially hired to work at 12-A No. 1 were not panel members. Two additional panel members were hired during October. The panel members hired from the laid-off panel were paid $6.875, $7.50, or $8.125 per hour, depending upon their job classification, in compliance with the rates that Ashby had offered the Union members at the first bargaining session. The nonpanel employees were paid at a higher rate--$10, $10.62, $12.50, and, in one instance, $13.75 per hour. Panel members were consistently assigned fewer hours than the nonpanel employees. Operations at 12-A No. 1 were shut down in October because of mechanical problems.
 
 
 10
 The 12-A Mine No. 1 was opened again in the middle of December. From that time onward, the Company did not employ any panel members at Mine No. 1. Those panel members Ashby had employed at Mine No. 1 were not recalled to that mine when it reopened. Shortly after Mine No. 1 was shut down in October, operations were commenced at 12-A No. 2. The employees at Mine No. 2 included the five panel members who started at Mine No. 1 along with a number of non-panel members.
 
 
 11
 By December, Ashby had hired Bobbie Cline as the Superintendent in charge of health and safety to replace W.P. Corbett. The ALJ discredited Ashby's testimony that he had instructed Cline to call from the panel and found instead that Ashby had instructed Cline not to hire from the panel. The judge found that Ashby also had instructed Dean Baldwin, the operator of Mine No. 2, not to hire panel members.
 
 
 12
 After his first bargaining session with the Union in August, Ashby and his labor relations consultant, Arville Sykes met with the Union about every other month until April 1989. The parties were trying to establish a collective bargaining agreement to cover the employment of production and maintenance employees at the Pittston 12-A Mine. When the Union first complained that Ashby was not hiring from the 12-A Mine panel, Ashby insisted that he was doing so. In the face of subsequent Union complaints, he asked for a copy of the Union's panel lists but did not deny the charges.
 
 
 13
 W.P. Corbett, Bobbie Cline and Dean Baldwin all acted as Superintendents to Mines No. 1 and No. 2 during these months. At trial, Ashby said these men were independent contractors who decided when to hire and fire their own employees. He acknowledged that he had an obligation under the contract to make sure they complied with the BCOA hiring provision, and that he was in violation of his own contract because he did not have written consent to sublease the mines. The ALJ found that Ashby entered into oral subcontracts with Baldwin and Cline to avoid his promise to the Union in negotiations to employ laid-off panel members as well as to undercut the Union's majority status. The ALJ also found that Ashby's determination to discourage membership in the Union was a motivating factor in his directions to the superintendents not to hire the union represented panel members. The evidence adduced at the hearing established and the ALJ found that Ashby was always in control of the operation of the mines and the employment practices at issue. The ALJ concluded that the Company was the employer of all the workers at the 12-A Mines from December 1988 to April or June of 1989. At no time did Ashby suggest to the Union during the ongoing negotiations that he had subcontracted any part of the 12-A Mines.
 
 
 14
 Bargaining ended after the mine employees struck on April 5, 1989. During the strike, Ashby sent letters to "all our employees" on Ramar (Ashby's coal-processing company) stationery, informing them that, if they did not return to work, they would be replaced permanently.
 
 
 15
 The NLRB has asked this court to enforce its order enjoining the Company from further unfair labor practices. The administrative law judge found and the NLRB affirmed that the Company violated Secs. 8(a)(5) and (1) and Secs. 8(a)(3) and (1).
 
 
 16
 Sections 8(a)(5) and (1) obligate the Company to bargain with the Union. Sections 8(a)(3) and (1) prohibit discrimination against Union members or any unfair treatment regarding terms and conditions of employment that would have the tendency to discourage Union membership. The NLRB adopted the ALJ's finding that Ashby discriminated against the former JRMC employees to avoid employing a majority of Union workers. The Union's majority status would necessitate Ashby's bargaining with the Union.[6] The ALJ found that Ashby flouted his obligation to hire from the 12-A panel in order to undermine the unionization of the mines. This finding was based in large part upon the ALJ's personal impression of Ashby's credibility after hearing him testify.[7] The NLRB affirmed the ALJ's decision noting that Ashby's "obligation" was a result of his oral, voluntary pledge to the Union.
 
 
 17
 Resolution of the issues requires only a review of the NLRB's factual findings. These findings are conclusive if supported by substantial evidence on the record as a whole. NLRA Sec. 10(e), 29 U.S.C. Sec. 160(e).
 
 I. The Secs. 8(a)(5) and (1) Violation
 
 18
 Notwithstanding the terms of Ashby's lease agreement, the NLRB found that the Company, as a successor employer under the Act, was not required to assume any of the terms of the predecessor's contract with the UMWA.[8] NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272, 291 (1972).
 
 
 19
 Despite this premise, the NLRB found that the Company violated Secs. 8(a)(5) and (1) by unilaterally changing its hiring practice of employing individuals on the contractual laid-off panel.[9] Although the Company did not have a legal obligation to assume the terms of employment established by its predecessor, the Company assumed a bargaining obligation of its own when the Company made a direct, voluntary pledge to the Union before hiring any employees that it would honor the panel rights of the employees laid off by JRMC. The Board found that the Company pledged itself to follow the hiring procedures set forth in Article IA of the BCOA agreement. Ashby's pledge established these procedures as the terms and conditions of the Union members' employment. Consequently, the Company's obligation to the UMWA under Secs. 8(a)(5) and (1) arose solely out of its voluntary pledge to the Union.
 
 
 20
 The Board's finding is conclusive because it is supported by substantial evidence--that is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). The reviewing court must not displace the Board's choice between fairly conflicting views of the evidence "even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).
 
 
 21
 The Company has argued that the Union consistently relied upon the contract between JRMC and the Company to define the Company's obligations to the panel members. Although that argument may be true, it does not have any bearing on the outcome of the issue before the Court. The Union's "understanding" of the Company's obligation is irrelevant. Rather, the nature of the Company's actual obligation is at issue. The NLRB explicitly stated that the Company's obligation arose out of the Company's voluntary pledge rather than the Company's contract with JRMC. The validity of the NLRB's order and not the legal merit of the UMWA's initial argument is the issue before the court. The Board's decision is supported by substantial evidence in the record.
 
 
 22
 The basis for the finding that the Company made a pledge to the Union was the "uncontradicted" testimony of Donnie Lowe, Union Field Representative, that Company President Ashby stated at the first meeting with the Union in August of 1988 that Ashby"was going to call the panel." Ashby also said during that meeting that he was willing to bargain with the Union employees. The Company does not deny the statement. The Company maintains, however, that a statement that it would hire from the panel did not mean that it would hire from the panel exclusively or that it would comply with the requirements of Article 17 of the expired collective bargaining agreement.
 
 
 23
 Lowe's report of Ashby's statement to the Union provides minimal support for the ALJ's finding adopted by the NLRB. Ashby's statement that he would call from the panel could be attributed a number of meanings as the contradictory interpretations of the parties indicate. The context within which Ashby made that statement, however, supports the ALJ's conclusion. First, Ashby told the Union that he would call from the panel after he signed an agreement with JRMC requiring him to do so. During his testimony before the ALJ, Ashby acknowledged his obligation to JRMC to hire from the panel under the lease agreement.[10] Ashby maintained that his compliance with that contract was a matter between himself and JRMC. The Board agreed, finding that Ashby's obligation to the Union arose out of his voluntary pledge to the Union itself, not out of his contract with JRMC. In any event, it was in the context of such an agreement and with knowledge of his obligations under that agreement that Ashby stated to the Union that he would, in fact, call from the panel.
 
 
 24
 Second, Ashby, as president and sole stockholder of Ramar Coal Co., Inc., had signed a lease agreement containing an identical successorship provision with JRMC for the No. 18 Coal Preparation plant in Buchanan County, Virginia. Pursuant to that agreement, from May 1988 to December 1988, almost the exact same time frame involved in the instant case, Ashby complied with his contractual obligation to hire from the panel for the No. 18 Preparation plant.
 
 
 25
 It is also undisputed that [the Company] recognized its obligation under the lease agreement with [JRMC] to hire its employees from the [JRMC] panel and did so from the time it commenced operations until the pay period ending December 10 [1988] when it began hiring employees from non-panel sources. Ramar Coal Co. and UMWA, Case 11-CA-13265, Addendum to the Company's Brief at 10.[11]
 
 
 26
 Finally, Ashby's behavior over the ten months after the mines opened (from August 1988 until the following April) indicated that he believed he had an obligation to hire from the JRMC panel. He participated in negotiations with the Union on matters involving wages and benefits throughout that time period. During those negotiations, panel hiring was discussed numerous times. On these occasions, Ashby indicated that he believed he was fulfilling his obligation. He sent thirty-six letters to panel members. (There were 81 panel members he could have contacted and, ultimately, he hired only seven.) On another occasion, he requested that the Union provide him with more copies of the panel sheets.
 
 
 27
 The context within which Ashby made his statement to the Union supports the Board's interpretation of that statement--that Ashby initially planned to hire panel members in accordance with his obligation under the leasing agreement with JRMC. Thus, Ashby established a hiring practice and proceeded to violateSecs. 8(a)(5) and (1) by unilaterally changing that practice without bargaining with the Union.
 
 II. The Secs. 8(a)(3) and (1) Violation
 
 28
 The NLRB found that the Company violated Secs. 8(a)(3) and (1) by refusing to hire almost all of the 12-A Mine's panel members.[12] Ashby did hire seven out of 81 panel members. He testified that he instructed his superintendents to hire from the panel as well. The ALJ did not believe his testimony. The ALJ said of Ashby, "by his demeanor on the stand, Ashby impressed me as a most untrustworthy witness who was willing to fabricate any testimony that might help [the Company's] cause."
 
 
 29
 The NLRB also found that the Company discriminated against the panel employees it did hire in terms of wages and hours in order to discourage membership in the Union. Ashby was paying panel employees approximately half of the union scale. Non-panel members were paid significantly more than panel employees. Ashby was involved in on-going negotiations with the Union over acceptable wages for the panel employees. The ALJ found that the panel members' wages were never raised to the nonunion wage being paid the non-panel employees. He concluded that Ashby's discrimination against panel employees "obviously discouraged support for the Union."
 
 
 30
 The ALJ ordered the Company to make the employees whole for their lost hours of work and the difference between their wages and the wages of non-panel employees plus the interest.
 
 
 31
 The ALJ's findings that Ashby was involved in discriminatory hiring practices regarding wages, hours and terms of employment are supported by substantial evidence. Under Ashby's hiring system, a panel member would have a better job opportunity if he applied for work as a non-panel, non-union applicant. Such incentive may be interpreted as employer activity discouraging union membership in violation of Secs. 8(a)(3) and (1). Finally, even the Company recognizes that if Double A were required to hire in accordance with the panel procedures set out in Article 17, Double A would never be able to hire anyone who was not a union member so long as there were any qualified union members who listed the job on their panel sheets. According to the ALJ's findings, Ashby could have hired as many as 81 panel members. He hired only seven, and he sent only 36 notices to members of the panel.
 
 
 32
 The National Labor Relations Board (NLRB) affirmed the ALJ's findings and conclusions and adopted the recommended Order, holding the Company in violation of Secs. 8(a)(5) and (1) for refusal to bargain with the union in good faith and Secs. 8(a)(3) and (1) for discriminatory hiring and employment practices. We find that substantial evidence on the record as a whole supports the NLRB's finding that the Company violated Secs. 8(a)(5) and (1) of the Act (29 U.S.C. Secs. 158(a)(5) and (1)). By unilaterally changing its hiring practice of employing panel members, the Company unlawfully refused to bargain with the Union as the recognized collective bargaining representative of its production and maintenance employees. We also find that substantial evidence on the record as a whole supports the NLRB's finding that the Company violated Secs. 8(a)(3) and (1) of the Act (29 U.S.C. Secs. 158(a)(3) and (1)) by discriminating against panel employees in terms of hours and wages to discourage membership in the Union. In addition, the Company has engaged in unfair labor practices affecting commerce within the meaning of Secs. 8(a)(3) and (1) by failing and refusing to hire the qualified senior employees on the Pittston 12-A Mine panel to discourage membership in the Union.
 
 Accordingly, the order is
 
 33
 ENFORCED.
 
 
 
 [1]
 The successorship clause in the lease agreement required Ashby to hire from JRMC's panel in accordance with an expired collective bargaining agreement, the National Bituminous Coal Wage Agreement of 1984 (the BCOA). Article IA(h)(2)-(6) set out the obligations of lessee-licensees, and Article 17 defined the panel rights of former employees of the signatory mines and the contractual requirements for offers of employment
 
 
 [2]
 Although he testified that he did not make a pledge to the Union that he would hire only panel members, James Ashby testified that the successorship clause of the agreement between the company and JRMC did obligate the Company to hire from the panel. At the hearing, he asserted that only JRMC has an action against him for breach of contract, and that the union could not enforce the hiring provision against him
 
 
 [3]
 Eight of the 18 letters were received on or after August 20, precluding the recipients from attending the scheduled meeting. In addition, most recipients had only one day rather than the four prescribed by 17(e) to accept the offers
 
 
 [4]
 Three of these letters were received on or after August 31
 
 
 [5]
 Forty-five panel members did not receive any notice at all
 
 
 [6]
 The record shows that Ashby negotiated with the Union on some issues throughout the relevant time period. Negotiations ended when the strike began in April
 
 
 [7]
 The judge wrote that "[b]y his demeanor on the stand, Ashby impressed me as a most untrustworthy witness who was willing to fabricate any testimony that might help Double A's cause." The NLRB's "established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. We have carefully examined the record and find no basis for reversing the findings." 307 NLRB No. 115 at 2 (citation omitted). The NLRB reviewed the record and found no basis for reversal
 
 
 [8]
 "It is well established, however, that a new and different employer that is considered a successor is not bound by its predecessor's agreement, though a successor does have an obligation to bargain with the union that was the recognized representative of the predecessor's employees.... A new employer may be bound by its predecessor's agreement in certain factual situations. The employer may be found, for example, to have either explicitly or impliedly assumed the collective bargaining obligations of its predecessor." EPE, Inc. v. NLRB, 845 F.2d 483, 487, n. 1 (4th Cir.1988) (citing Burns, citations omitted)
 
 
 [9]
 Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their right to engage in union activities. Section 8(a)(5) labels an employer's refusal to bargain collectively with the representatives of his employees an unfair labor practice
 
 
 [10]
 
 Q: By the terms of that agreement that you entered into with ... Jewell Ridge Mining, Mr. Ashby, you were required to hire from what's referred to as the BCOA Panel, were you not?
 A: Yes, the mother panel of that mine, yes.
 Ashby also indicated that he was aware of his obligation to JRMC when he testified that he told his superintendents, Dean Baldwin and Bobby Cline, that they would have to hire off the panel. (The ALJ discredited Ashby's testimony that he directed the superintendents to call from the panels.)
 Q: [Y]ou had a responsibility at all times [th]at Double A was operating to see that it was operated in compliance with this agreement with protected panel rights?
 A: I have to comply with this contract with Pittston to hire off the panel, which I hired off the panel.... By Pittston's contract with me, I was supposed to call off the panel for Double A Mining, Inc.
 
 
 [11]
 In that proceeding, the ALJ concluded, based on the entire record, that the company had not violated the NLRA in any manner alleged in the complaint. According to the ALJ, then, Ashby complied with his obligation to hire from the relevant panel at all times
 
 
 [12]
 Section 8(a)(3) provides that discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization constitutes an unfair labor practice